**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**   )<br>)<br>)<br>**Plaintiff,**    )<br>)<br>v.    )<br>)<br>**QUINCINO LAMONT WAIDE, JR.,**   )<br>)<br>)<br>**Defendant.**    )<br>) | NO. 5:25-MJ-5253-MAS |

**MEMORANDUM OPINION & ORDER**

The United States has asked this Court to detain defendant Quincino Lamont Waide, Jr., in a matter that questions a well-worn adage: are you, in fact, the company you keep?  If not guilty by association under the law, can you be deemed so dangerous by association such that the Bail Reform Act demands your pretrial detention?  The answer is complicated.  Waide's own conduct, the § 922(g) charge in this case, and his decision to continually engage in and promote a violent gang compel the Court to detain him.  The Court explains its rationale below.

**I.     BACKGROUND OF THE HOT BOYZ GANG**

To properly analyze the company Waide keeps, the Court must first provide some general context of that company.  According to FBI Special Agent Isaac Robison, Waide is a member of Hot Boyz, a criminal street gang in Lexington, Kentucky.  Robison supported this claim with photos of Waide and other Hot Boyz members

together flashing gang signs, as well as direct messages between Robison testified Hot Boyz has the following self-identified members: Waide, Daquis Sharp, Jatiece Parks, Desmond Bellomy, William Dixon, Chance Gist, and DeAngalo Boone. Hot Boyz is associated with the "West End" and frequently feuds with rival "East End" gangs. These feuds have often resulted in violence and death.

- On March 29, 2020, Zion Clark was murdered in a shooting that resulted in injury to Waide. The murder remains unsolved.

- On December 28, 2020, Ja'Quis Ray, brother of Sharp, was murdered. Ray was Waide's childhood best friend.

- On May 17, 2022, Eric Boone, the father of Sharp, was murdered.

- On August 27, 2023, Malik Sleet was murdered. According to the United States' proffer, Malik Sleet was "not wrapped up in all of this. He just happened to be related to the wrong people." [DE 6, Recording at 1:43:20]. Robison testified the primary suspects in this murder were the Hot Boyz.

- On October 29, 2023, Kristopher Lewis was murdered. Lewis was cooperating with federal authorities. As discussed further below, the United States believes the Hot Boyz were behind the targeted assassination.

- On October 24, 2024, Jadyn Sleet was murdered. Members of the Sleet family belong to a rival street gang and have had "significant issues" with the Hot Boyz over the past few years, according to Robison. The

> United States described the Hot Boyz as "antagonizing" the Sleet family for "years." The Court surmises the United States provided all of this information to imply the Hot Boyz were involved in or responsible for Jadyn Sleet's murder.

- On October 26, 2024, passengers of a car ambushed a stopped car at an intersection in Lexington, Kentucky. The stopped car fled, and the other car gave chase at high speeds through a residential neighborhood with both cars exchanging fire. As discussed below, the United States posited that Waide was driving the stopped car.

For most of these incidents, Waide' sole involvement is his association with the Hot Boyz gang. For three of them, however, Waide was allegedly involved. The Court explores these three instances in more detail below as part of its analysis.

## II. ANALYSIS

Waide is charged with illegally possessing a firearm and ammunition as a person with a prior misdemeanor conviction for domestic violence. [DE 1]. At the initial appearance, the United States moved for pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(E). Waide requested a detention hearing and a preliminary hearing. The Court scheduled both for May 27, 2025, and took proof on both probable cause and detention. After finding probable cause that a crime has been committed and Waide committed it, the Court turned to the issue of detention.

### A.   LEGAL STANDARD

The Court afforded both sides all procedural rights outlined in the Bail Reform Act ("BRA"). The United States bears the burden to prove a defendant should be

detained pretrial. Detention premised on nonappearance requires preponderant evidence. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-CR-82-DCR, 2006 WL 2037406, at *6 (E.D. Ky. Jul. 18, 2006). Danger-based detention, however, demands clear and convincing evidence that no combination of conditions will reasonably ensure community safety. 18 U.S.C. § 3142(f). The analyses are distinct. Conditions that sufficiently target nonappearance risk may not adequately address danger potential. *See United States v. Mercedes*, 254 F.3d 433, 436-37 (2nd Cir. 2001). Further, condition effectiveness inherently hinges on a defendant's predicted good faith compliance. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (characterizing predicted compliance as critical release component); *United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (noting the "critical flaw" in a set of proposed release conditions: "In order to be effective, they depend on [the defendant's] good faith compliance."); *id.* at 1093 n.13 (observing that, barring a "replica detention facilit[y]," the success of any condition combination necessarily "hinge[s] on [the defendant's] good faith compliance").

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The key is simply evidentiary reliability and accuracy. *See, e.g.*, *United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291, 1998 WL 381686, at *1 (6th Cir. June 22, 1998). The Court properly considers a wide range of proof. The nature and quality of proof, though, impacts its probative value and weight in the detention calculus.

B.  **WAIDE'S DANGER TO THE COMMUNITY**

The § 3142(g) factors drive the analysis. Specifically, the Court must consider the history and characteristics of the defendant, the nature and circumstances of the offense charged, the weight of the evidence against the person, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g).

1.  **Waide's History and Characteristics**

The Court must consider many aspects of Waide's background in making the decision to release or detain him. Specifically, the BRA requires courts to "take into account the available information concerning— [ . . . ] the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation[.]" 18 U.S.C. § 3142(g)(3).

Waide is a 24-year-old Lexington, Kentucky, native. Waide has lived in the Lexington, Kentucky, area his entire life. Both of Waide's parents reside in Lexington, as do his four children. [Pretrial Services Report at 1-2]. Waide reported to USPO that he has resided with his mother at her home in Lexington since 2021. [Pretrial Services Report at 2]. USPO interviewed Waide's mother, LaSha Haddix, who also testified for Waide at the detention hearing. Haddix told USPO and testified that Waide lives with her but splits his time between her home and his girlfriend Tiara Lang's home in Richmond, Kentucky. Haddix testified that Waide could return

to live with her if he is released. [Pretrial Services Report at 2]. At the detention hearing, Waide acknowledged that his child lives with Lang, and he frequently visits overnight to spend time with Lang and their child. Haddix testified Waide is a hard worker who has been regularly employed and is an involved father.

Waide worked at the Hitachi Automotive factory from June 2024 until his arrest in April 2025. [Pretrial Services Report at 3]. Waide proffered he believes he can return to that position if released. Waide did not report any mental or physical ailments, other than his history of a gunshot wound in 2020. He reported occasional use of alcohol and cannadinoids. [Pretrial Services Report at 3].

Waide has little criminal history. He has never been convicted of a felony. Waide has a prior misdemeanor conviction in Kentucky state court for "assault in the fourth degree (domestic violence)." [DE 1 at Page ID# 9]. According to Robison's testimony and the Complaint, the assault conviction arose from an incident in February 2022 when Waide pushed a then-girlfriend to the floor, strangled her, and hit her in the face, all while she was holding their infant in her arms. The baby hit his head during the assault. Attendant to that assault conviction, Waide was also convicted of attempted intimidation of a participant in the legal process and trafficking in marijuana, less than eight ounces. [Pretrial Services Report at 4]. Waide successfully completed his sentence of two years' probation for these offenses on March 1, 2025, without any violations. [Pretrial Services Report at 4]. Importantly, the United States pointed out that Waide was on probation at the time of many events involving the Hot Boyz. The Court found probable cause that Waide

possessed a firearm from October 24, 2025, through the date of his arrest. At least some of that time covered the time Waide was also on state probation, a specific fact the BRA requires the Court to take into consideration.

As part of the incident that led to the Complaint in this case, the Commonwealth charged Waide with fleeing or evading the police, and that charge remains pending. As described below, Waide retreated into an apartment when law enforcement arrived and refused to leave for around 25 minutes, resulting in the fleeing or evading charge.

Waide also had an emergency protective order against him from August 1, 2021, until February 3, 2022. It appears the petitioner for the emergency protective order was the victim in the assault case that transpired a few weeks after the protective order expired. [Pretrial Services Report at 4].

The United States introduced a surfeit of evidence proving that Waide is a member of Hot Boyz and has frequent contact with the other members of Hot Boyz. The United States produced photographs of Waide with other Hot Boyz members in which they were displaying Hot Boyz gang signs or signs disrespecting rival gangs. The United States proffered Waide was in Dixon's music video, posted to YouTube, in which members of the Hot Boyz brag about the murder of Malik Sleet. Beyond that, the United States emphasized Waide's alleged role in three incidents.

### a.   *Murder of Zion Clark*

The United States did not provide much detail of this murder of Zion Clark. Rather, the United States noted two things. First, Waide was shot and is a victim in

this incident. Second the United States proffered that after Waide was shot, Waide told a witness that he knew who had shot him and he was "going to get them," but, according to the United States, Waide was uncooperative with law enforcement.

### b. *Murder of Kristopher Lewis*

SA Robison detailed the murder of Kristopher Lewis and the suspected connections to the Hot Boyz gang. In 2022, Rollie Lamar and Kristopher Lewis were indicted in 5:22-CR-50-GFVT-MAS, for offenses including conspiracy to distribute marijuana and conspiracy to commit money laundering. Robison testified that Lamar believed Lewis cooperated with law enforcement, leading to the arrest of Lamar. Although Lewis's cooperation did not lead to the arrest of Lamar, Lewis had, ultimately, decided to cooperate with law enforcement and was scheduled to testify at Lamar's trial. Prior to Lamar's trial, however, Lewis was murdered on October 29, 2023.

Through various investigatory means, law enforcement came to believe the Hot Boyz were responsible for Lewis's murder, likely at the direction of Lamar. Specifically, law enforcement believes Boone, Sharp, and Dixon were at the scene of the murder. The vehicle used as the getaway car from the murder scene was known to be driven by Sharp and was later found abandoned. Robison testified that law enforcement determined Sharp began driving a Dodge Durango after the Lewis murder, and that Waide's phone location information put him in the vicinity of where the getaway vehicle was abandoned, implying that Waide facilitated the vehicle switch.

Finally, Robison discussed text messages between Dixon and Sharp, extracted from Dixon's phone, from the night of Lewis's murder. Around the time the messages were sent, Waide's cell phone was in the same location as Dixon's. In those messages, Dixon and Sharp refer to "4 of us" and state they were going to get "a band" to split, for "250 each." Robison interpreted this to mean Sharp, Dixon, Boone, and Waide were each getting paid for their involvement in Lewis's murder. However, there was no overt mention of Lewis's murder in the text messages.

The United States alleged it intends to charge Waide related to this murder in a future indictment, but the United States has not indicted any parties for Lewis's murder at the writing of this opinion. And although the United States has not proven Waide's direct involvement in the murder of Lewis, the United States proved that suspects in the Lewis murder were texting about paying Waide later that day and that Waide's cell phone was in the vicinity of the abandoned vehicle that was used as the getaway vehicle from the murder. This does not suggest that Waide was involved in or responsible for the Lewis murder; however, it does strongly suggest that Waide is uncomfortably close with murder suspects and a getaway car.

### c. *Ambush & Car Chase*

On October 26, 2024, just two days after the murder of Jadyn Sleet, an individual driving a black or navy Chevrolet Cruze came to a stop at the interaction of Old Todd's Road and Palumbo Drive in Lexington, Kentucky. A silver Lexus stopped just behind the Cruze. A dash cam from another car as well as various front

door security cameras in the neighboring residential neighborhood captured what happened next.

Four individuals exited the silver Lexus and began firing countless rounds into the Cruze. The Cruze then sped off into the surrounding neighborhood. The four individuals returned to the silver Lexus and gave chase. The vehicles continued through the residential neighborhood at high speeds with gunfire coming from both cars. Robison testified the Cruz was later found abandoned with three tires shot out. The Cruz had been registered in the name of Waide's aunt, who law enforcement knew to have registered vehicles in her name for Waide's use in the past. Law enforcement located medical records belonging to Waide in the backseat of the Cruz. Finally, witnesses described the driver of the Cruz as a black male with dreadlocks, which is a description that—in the most general sense—fits Waide.

In the end, the parties have presented much for the Court to consider. On one hand, Waide has strong family ties, a work history, and minimal criminal history. On the other, his minimal criminal history is a violent offense and his gang association, in the best of light, demonstrates he continually surrounds himself with dangerous individuals and on more than one occasion that danger has found him. Overall, while close, the Court concludes this factor tips slightly towards detention.

C. **THE NATURE AND CIRCUMSTANCES OF THE OFFENSE CHARGED**

The BRA requires Courts to consider the "nature and circumstances of the offense charged, including whether the offense . . . involves a . . . firearm[.]" 18 U.S.C. § 3142(g)(1). The charge arose from an incident on April 24, 2025, when law enforcement came to Waide's residence to execute a search warrant on his cell phone,

related to the Lewis murder investigation. According to Robison, the Complaint, and the Pretrial Services Report, law enforcement arrived and found Waide outside Lang's apartment walking a dog. When law enforcement announced their presence, Waide rushed back inside the apartment, holding his waistband area in a way that suggested to the officers on the scene he was holding a firearm. Waide and Lang eventually exited the apartment about 25 minutes later. [DE 1 at Page ID# 4]. Law enforcement then obtained a search warrant for the apartment. The search of the apartment revealed a Glock 21 .45 caliber handgun in the HVAC vent of a child's bedroom, on silver Hornady .45+P auto bullet, one magazine containing 14 rounds of .40 caliber ammunition, 43 rounds of 9mm ammunition, and 18 rounds of .45 caliber Sig Sauer silver bullets. [DE 1 at Page ID# 5]. Officers also located Waide's cell phone, which had been factory reset. [DE 1 at Page ID# 6].

Lang claimed ownership of the Glock 21. Further investigation later revealed two important facts about the Glock 21: First, ballistic testing indicated the shell casings found in the abandoned Cruz that was involved in the October 26, 2024, shooting matched the Glock 21 found in Lang's child's bedroom vent. Second, law enforcement traced the purchase of the Glock 21, discovering that Lang purchased it on August 11, 2022, as listed in the Complaint affidavit, or on October 11, 2022, as Robison testified. Robison testified—and the government argued repeatedly—that Lang purchased the Glock 21 the day after Waide's birthday and speculated that the Glock 21 was a birthday gift. Waide's birthday is August 10. Other than the date Lang purchased the gun, which, again, is unclear, the United States had no evidence

that Lang purchased the gun for Waide or as a birthday gift. However, the Court is convinced it is extremely likely that the Glock 21 was used by the driver of the Cruz on October 26, 2024, and that Waide was the likely driver of the Cruz.

With this factor, the Court focuses exclusively on the charged conduct separate and apart from Waide's history and activity via the Hot Boyz. This is not a presumption case. Generally, while firearms are a danger, the Court questions whether a violation of § 922(g)(9) alone would rise to clear and convincing evidence of a danger. However, the circumstances of the predicate offense here are particularly dangerous, involving several physical acts of violence and a minor injury to an infant. Coupled with the history of the firearms in relation to the gang activity, the United States has raised legitimate danger concerns.

D.   THE WEIGHT OF THE EVIDENCE OF DANGEROUSNESS

In weighing the strength of the evidence, the district court may not modify or limit the defendant's presumption of innocence. 18 U.S.C. § 3142(g). "[T]he § 3142(g) analysis is concerned with a practical assessment of the defendant's dangerousness, rather than an adjudication of guilt for a particular offense." *United States v. Tolbert*, 2017 WL 6003075, at *5 (E.D. Tenn. Dec. 4, 2017) (citing *Stone*, 608 F.3d at 948).

This BRA factor is somewhat duplicative of the first and third because, in considering a defendant's overall dangerousness, the Court must consider the facts of the crime alleged as well as evidence that the defendant has been dangerous in the past, such as criminal history and a history of violent behavior. The United States most heavily stressed Waide's involvement in the Hot Boyz, the gang wars, and the Lewis murder. However, not all of that evidence pertains to Waide. Rather, the focus

for Waide are the following issues: (1) he was involved in two shooting incidents, one of which allegedly resulted in him firing back during a dangerous high speed chase; (2) Waide generally associates and promotes individuals suspected (but not charged in) numerous murders and shootings; (3) Waide has a demonstrated history of domestic violence; (4) Waide possessed a firearm following his domestic violence conviction; and (5) there is circumstantial evidence suggesting Waide may have played a role in the murder of Kristopher Lewis. Waide's connection to these issues, in some instances, are acute while in other it is obtuse, at best. However, one conclusion is clear: Waide's associations are steeped in violence and homicides. Although gang affiliation without evidence of any link to "gang fratricide or violence" is often considered a limited danger factor, association itself weighs in favor of detention. *See United States v. Salgado*, No. 20-53JJM, 2020 WL 4747931, at *7 (D.R.I. Aug. 17, 2020) (collecting cases discussing affiliations with gangs and their import as to violence under the BRA). Although the United States has provided more smoke than fire in Waide's case, there is enough fire to conclude Waide's conduct and associations lead to a conclusion of overall dangerousness.

E.  **THE NATURE AND SERIOUSNESS OF DANGER POSED BY RELEASE**

The Court must weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). As discussed above, the United States presented ample evidence that Waide has connections to gang members and criminal activity. However, the United States has not shown that he poses a serious risk of danger or nonappearance if released.

There is certainly proof, as detailed above, that Waide has engaged in specific instances of violence that posed a risk of danger to another person or the community. First, Waide has a history of domestic violence with concerning circumstances. Second, the United States introduced compelling evidence of Waide's past dangerousness to the community as related to the October 2024 ambush and car chase. Third, Waide's associations with the Hot Boyz has resulted in constantly troubling conduct.

The United States stressed that the nature of the danger to another person (implicitly, not just the domestic violence victim but members of rival street gangs) and the community is serious, if not life-threatening. Once again, as discussed above, the United States often relied upon conjectures and circumstantial evidence relevant to Waide. The United States argued there are no release conditions that can mitigate the danger posed, because Waide lived with his mother (where he suggests he reside if released) while engaging in gang activity, and that he was on probation while engaging in gang activity, including the October 26, 2024, shooting.

Weighing all the totality of the evidence before it, the Court agrees. There is simply too much violence and chaos in Waide's orbit. The Court has sincere fear that Waide will continue to surround himself with violence and chaos if released and despite what conditions the Court could craft.

F.   **NONAPPEARANCE**

The United States did not address whether Waide is a risk of nonappearance, and, thus, did not carry its burden to prove by a preponderance of the evidence that he poses a risk of not appearing for future court dates.

### III.  CONCLUSION

The United States cast many aspersions at Waide to meet the high bar of clear and convincing evidence to detain him pretrial. Some of this evidence (*i.e.*, the domestic violence conviction, the ambush and car chase, gang affiliation, gun possession) appears much more concrete than others (*i.e.*, Waide's role in Lewis's murder or the Hot Boyz's role in the Sleet murders). The Court began the opinion by asking the question of whether a person is measured by the company they keep. While not wholly determinative, it is difficult to overcome that Waide, his associates, and his adversaries appear to have been both the victims and the perpetrators of violence for years.

On balance, the Court finds that the BRA demands pretrial detention in this case. As to the risk of nonappearance, the United States did not demonstrate by a preponderance of the evidence that Waide is unlikely to appear as required. The Court also finds that the United States did show by clear and convincing evidence that Waide is an unmitigable danger to the community or others.

Accordingly, **IT IS ORDERED** that the United States' oral motion for detention is **GRANTED** and directs that Waide be detained pending resolution of the allegations against him.

The parties may appeal this Order under the terms of 18 U.S.C. § 3145(a).

Signed this the 4th of June, 2025.

*Matthew A. Stinnett*
MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY